**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE OF STANWICH MORTGAGE LOAN TRUST K<br><br>    PLAINTIFF<br><br>v.<br><br>WILLIAM N. COCHRAN<br><br>    DEFENDANT(S) | CIVIL ACTION NO:<br>1:23-cv-00133-NT |

**PLAINTIFF'S MOTIONS**

**1) TO TERMINATE STAY OF PROCEEDINGS;**
**2) TO ENTER FINDING THAT MEDIATION IS COMPLETE;**
**3) TO RESCIND ORDER TO FILE STIPULATION OF DISMISSAL;**
**4) TO ENFORCE SETTLEMENT AGREEMENT; and**
**In the alternative**
**5) TO DISMISS CASE *WITHOUT* PREJUDICE**

COMES NOW Plaintiff Wilmington Savings Fund Society, FSB as Trustee of Stanwich Mortgage Loan Trust K ("Wilmington") by and through undersigned counsel and moves this Court for entry of Orders as listed above.

Counsel for Defendant Cochran has been consulted via e-mail and telephone regarding the motions listed above.  His position as to each is represented as follows:

   1)    Termination of Stay: AGREED

   2)    Completed Mediation: AGREED

   3)    Rescind Order to file Stipulation of Dismissal: AGREED

1

4) To Enforce Settlement Agreement: OPPOSED

5) To Dismiss Case *WITHOUT* Prejudice: OPPOSED

I. STATEMENT OF THE CASE

Plaintiff commenced this foreclosure on March 15, 2023 (ECF No. 1).

Pursuant to Cochran's request, the matter was *stayed* concurrent with a referral to Maine's Foreclosure Diversion Program (ECF No. 11).  On October 11, 2023, Cochran's newly retained counsel filed a Motion to Amend Cochran's previously filed Answer and requested permission to file a counterclaim adding Carrington Mortgage Servicing ("CMS") as a counterclaim-defendant (ECF Nos. 18 and 19).

Wilmington retained new counsel (the undersigned) who appeared on December 15, 2023 (ECF No. 18) and opposed Cochran's Motions, which this Court DENIED January 2, 2024 (ECF No. 33).

On March 19, 2024, Wilmington filed a Mediation Status Report containing a Notice of Intent to Dismiss this matter (ECF No. 35), followed by a Notice of Settlement on May 10, 2024 (ECF No. 36).

These motions became necessary when Cochran's counsel repudiated via e-mail on Wednesday evening May 29th, as supported below.

II. STATEMENT OF FACTS

It is anticipated that few, if any, facts related below are in dispute. Therefore, to isolate the issues to be determined, each is designated by issue, and numbered paragraph.

A. The Stay, A Finding that Mediation is Complete, and The Order to File Stipulation of Dismissal

1. This matter was stayed for the pendency of the reference to the Maine Foreclosure Diversion Program (ECF 11).

2. Plaintiff, by and through predecessor counsel timely filed status reports (ECF Nos. 12-17) while the parties awaited the assigning of a Mediation Docket No. and the scheduling of a mediation session.

3. A mediation docket number was assigned to the matter (AUGDC-RE-2023-7, and the initial mediation session was set for November 7, 2023. That session was continued by mutual agreement due to the retention of current counsel for Defendant Cochran and rescheduled for December 12, 2023. (See Status Report 11/22/23, ECF 21).

4. By the time the December mediation session occurred, the parties had commenced litigation affirmative claims asserted by Defendant via Motions to Amend his Answer, and to add Carrington Mortgage Services, LLC ("CMS") as a counter-defendant.

5. The undersigned was retained by Wilmington and appeared shortly thereafter (ECF 25). The mediation was continued, and eventually reset for March 12, 2024.

6. By March 12, 2024, the Court had DENIED Defendant Cochran's pending Motions (ECF 33), and Defendant filed a *separate* action against CMS on January 20, 2024, having Case No. **1:24-cv-00010-NT**. For clarity this will be referred to as the "Cochran Action")

7. The Cochran Action has progressed through the initial pleadings stage, with the Court issuing a Proposed Scheduling Order on June 6, 2024 (ECF 10).

8. At the mediation session of March 12, 2024, the undersigned informed the mediator of Wilmington's intent to file a Motion to Dismiss the Foreclosure, which both parties anticipated would be litigated as to the nature, character, and conditions of the dismissal (namely with or without prejudice, and under what conditions). The mediator filed a report indicating that if the matter was not dismissed, that another session might be scheduled. That report was filed with the Court as part of the undersigned's March 19, 2024 Status Report (ECF 35).

9. Following the March 2024 mediation session, the parties conducted negotiations regarding the disposition of the foreclosure matter. By May 10, 2024, *with the authorization* of Counsel for the defendant, the undersigned informed the Clerk's office that the foreclosure matter had been resolved, thus setting in motion the 30-day period within which to file a Stipulation of Dismissal (ECF 36).

10. Based upon an e-mail received from opposing counsel on the evening of May 29, 2024, and opposing counsel's lack of response to attempts to further dialog, the undersigned filed an updated Status Report informing the Court that there was a failure to consummate the settlement (ECF 37). Wilmington also filed a Motion to Restore this matter to the active docket, and notified the Court that these Motions would be forthcoming (ECF 38).

### III. ARGUMENT, EVIDENCE, AND AUTHORITY

### A. THE AGREEMENT

The parties in this case, via counsel, and in consultation with their respective clients reached a settlement in this foreclosure matter. The Agreement consisted of a Mortgage Modification Agreement and a "Settlement Agreement, Release, and Reservation of Rights", attached hereto as EXHIBITS 1 and 2 respectively (redacted to remove PII).

Terms of the settlement contained in these Exhibits include the following precise terms, each of which were negotiated with precise outcomes as to, *inter alia*;

1) Reinstating the mortgage loan as current, with an initial payment on the modified agreement due June 1, 2024;

2) An extended amortization/maturity date effecting a waiver of interest and all loan or servicer charges, fees, and expenses other than unreimbursed tax and insurance advances since a 2022 cessation of payments due to the impending foreclosure captioned above;

3) The deferral of the outstanding escrow advances as of the date of the modification (EXACTLY **$10,994.44**) *until maturity*, refinance, or transfer/sale by Mr. Cochran as a non-interest-bearing balloon payment via an allonge to be executed and recorded within 30 days *after* recordation of the Modification agreement referenced herein;

4) a reservation of **all** rights asserted by William N. Cochran in the Cochran Action;

    5)     waivers of foreclosure costs, fees, and servicer expenses;

    6)     waivers of all late charges;

    7)     payment of all borrower's attorney's fees (precisely calculated and agreed upon as totaling exactly **$8515.00**); and

    8)     a post-signature of a dismissal without prejudice and without costs.

B.    WHAT HAPPENED?

On the evening of **May 29th**, expecting to receive a texted or e-mailed confirmation of the execution of all exchanged documents, the undersigned received an e-mail from Borrowers counsel stating:

> *Hi, Bill,*
> *Upon further review of the terms you've provided and review with my client, we've determined that they're not acceptable as the terms do not reflect our conversations.  Can you let me know your clients' positions on consolidating the Wilmington v. Cochran and Cochran v. Carrington cases?*

Almost instantly, the undersigned replied via mobile phone:

> *Which Terms.*
> *Let's make sure we are not dealing with a typo, or something we didn't pick up.*
> *I went over the attachment's again and Indid (sic) not see anything wrong*

About a half-hour later, receiving no reply, the undersigned sent the following from my remote office:

> *John:*
>
> *This is a restatement of by phone sourced e-mail from earlier today, that was sent upon receipt of your e-mail beginning, "upon further review".*
>
> *It is very important that you tell me exactly what you contend is "inconsistent with our conversations" in the documents I forwarded to you.*

> *I strongly urge you to do so on an immediate basis, given that I have made representations to the Court, and to others regarding the status of both cases.*
>
> *I look forward to hearing from you, even as I re-check, for the third time, where the documents I sent could have run afoul of any of our discussions.*

Receiving no response, on Friday, May 31, the undersigned, made a final try to salvage the agreement by writing (under the subject line Cochran – Airbill for Documents):

> *John:*
>
> *I remain hopeful that you and Mr. Cochran will step back from the position expressed in your Wednesday evening e-mail.*
>
> *As I promised, attached is an airbill for you to return the signed duplicate originals of the Modification Agreements, and the Settlement Agreement, which can be sent together, rather than separately. We will send back the second countersigned original, and the first will be recorded.*

All three of the above referenced e-mails are attached and filed together as Exhibit 3.

There was no further dialogue about the failure, other than to discuss timing of these motions in connection with the filing the Notification to the Court about the fate of the settlement (ECF 37).

Wilmington says, "We had a deal".

Cochran says, "No, we didn't".

    C.    WHAT ARE THE PRECEDENTS THAT GUIDE HOW TO DECIDE WHETHER A VALID, ENFORCEABLE SETTLEMENT EXISTS?

Maine's State Courts, and those within this District have been called upon to decide that question many times over the years. Guidance available for this settlement examination (at least to start) can be distilled to two cases: *Doe v. Lozano*, 2022 ME 33, 276 A.3d 44 and *Concordia Partners, LLC v, Ward*, No. 2:12-CV-138-GZS, 2014 WL 3378663 (D. Me. July 9, 2014).

From *Doe, infra,* we learn:

> ¶13] A settlement agreement is **analyzed as a contract** and the existence of a binding settlement agreement is a question of fact reviewed for clear error. *2301 Cong. Realty, LLC v. Wise Bus. Forms, Inc.*, 2014 ME 147, ¶ 10, 106 A.3d 1131; *Est. of Snow*, 2014 ME 105, ¶ 11, 99 A.3d 278. For a binding agreement to exist, "the parties must have mutually intended to be bound by terms **sufficiently definite to enforce**." *2301 Cong. Realty, LLC*, 2014 ME 147, ¶ 10, 106 A.3d 1131 (quotation marks omitted).
>
> [¶14] "[W]here parties read a settlement agreement that contains all the necessary elements of an agreement into the court record, no further fact-finding is required." *Est. of Snow*, 2014 ME 105, ¶ 19, 99 A.3d 278 (summarizing cases); *see, e.g., Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶¶ 2, 8, 968 A.2d 539 (explaining that the transcript of the judicially assisted settlement conference "conclusively establishes the existence of a binding settlement agreement ... and subsequent disputes that arose while attempting to reduce the settlement to a stipulated judgment did not affect" the court's authority to enforce the agreement). Further, in *Estate of Snow*, we affirmed a court's determination that no evidentiary hearing was necessary where the parties read the details of a settlement agreement into the record at a deposition. 2014 ME 105, ¶¶ 5-7, 21-22, 99 A.3d 278. Although the parties later failed to agree on written language reflecting the agreement, they did not dispute the accuracy or authenticity of the deposition transcript submitted to the court, which the court properly found reflected an unambiguous binding settlement agreement. *Id.* ¶¶ 7, 21; *see also 2301 Cong. Realty, LLC*, 2014 ME 147, ¶ 10, 106 A.3d 1131.[
>
> ¶15] If, however, the parties dispute the existence of an enforceable settlement reached outside the court's presence, "findings of fact regarding the terms of the agreement and the parties' intent may be required." *Muther*, 2009 ME 37, ¶ 6, 968 A.2d 539.

8

The reading of the terms of a settlement Plaintiff' contends (as documented below) that the contributions made by *both parties* to the agreement, and the inclusion (or omission) of items at the request of the Defendant leave little, if any doubt that an agreement was reached.

Certainly, should any material fact or element of contract be disputed in Defendant's objection that leave the Court in doubt, Plaintiff is eager to proceed to an expedited evidentiary hearing.

Judge Singal in *Concordia Partners, LLC v. Ward, infra.,* with internal citations included states:

> "A party to a valid settlement agreement may ask the courts to enforce that agreement when the other party refuses to comply." *Silva v. F/V Silver Fox LLC,* CIV.A. 13–10572–FDS, ⸺ F.Supp.2d ⸺, 2013 WL 5970703 at * 2 (D.Mass. Oct. 31, 2013) (*citing Quint v. A.E. Staley Mfg. Co.,* 246 F.3d 11, 14 (1st Cir.2001); *Petition of Mal de Mer Fisheries, Inc.,* 884 F.Supp. 635, 637 (D . Mass.1995)). "The law does not require that an agreement be signed in order for contracting parties to be bound." *N. Maine Transp., LLC v. OneBeacon Am. Ins. Co.,* 820 F.Supp.2d 139, 145 (D.Me.2011); *see also Fid. & Guar. Ins. Co. v. Star Equip. Corp.,* 541 F.3d 1, 6 (1st Cir.2008) (fact that agreement contemplated "execution of a more formal agreement" did not preclude enforcement of hand-written agreement). However, "[i]n order to be binding, a settlement agreement requires the mutual intent of the parties to be bound by terms sufficiently definite to enforce." *Muther v. Broad Cove Shore Ass'n,* 968 A.2d 539, 541 (Me.2009) (citing *Forrest Assocs. v. Passamaquoddy Tribe,* 760 A .2d 1041, 1044 (Me.2000)).
>
> Ultimately, "[s]ettlement agreements are analyzed as contracts, and the existence of a binding settlement is a question of fact." *Muther,* 968 A.2d at 541 (*citing Marie v. Renner,* 946 A.2d 418, 420 (Me.2008).) Thus, a "trial court may summarily enforce [a settlement] agreement, provided that there is no genuinely disputed question of material fact regarding the existence or terms of that agreement." *Fid. & Guar. Ins. Co.,* 541 F.3d at 5.

When focusing on the specifics of the matter before him, Judge Singal continued:

> The two-prong question for the Court is: whether a settlement agreement was reached that contains sufficiently definite terms and whether Ward agreed to be bound by those terms.

With these principles in mind, the evidence available, in part, appears below.

D.   THERE IS AMPLE EVIDENCE SUPPORTED BY CONSISTENT CONTRACT DOCUMENTS ON WHICH TO BASE A FINDING THAT THERE WAS A VALID AND ENFORCEABLE AGREEMENT.

Settlement negotiations in both this case and the Cochran case have been ongoing since each party retained current counsel. The context of what culminated in the creation of Exhibits 1 and 2 consists, in part of 127 e-mails, a dozen or so documents, and many phone conferences exchanged between counsel between January 2024, and the first week of June. (Declaration of William Fogel).

Because there was no post repudiation response from Defendant, it is difficult to predict *either* what Defendant will contend was a term "inconsistent with our conversations" *or* what the nature of the "inconsistency" might be.

This confusion does permit this Court to examine just the few actual material and authenticated documents attached as Exhibits to analyze the key contractual elements of **clarity** as contrasted with ambiguity; **detailed completeness** as compared to implication or omission; and **mutuality** rather than coercion, adhesion, or unfairness. As stated at the beginning, many of the facts and documents herein may *not* be the subject of dispute. Plaintiff

10

therefore reserves until *reply* the decision about whether to offer additional documents or declarations, or to request a formal evidentiary hearing.

The attached Declaration of William Fogel details how and when the underlying negotiations of the Cochran case became deferred in favor of proceeding first on the question of the dismissal of the foreclosure resulting in the construction of Exhibits 1 and 2.

On March 21st, the parties exchanged an e-mail which contained the following:

> Fogel:   Are you in a position converse with me about a possible bifurcation of the going forward mortgage while reserving rights, etc. and keeping your Plaintiff's claim?  If so, and you have time to kick up around, Let's talk later today if we can.  I am guessing that you and your client have likely had an idea in your mind about the mortgage.  We ought to talk about it.
>
> Steed:   A path forward where my client starts making mortgage payments and does not have a foreclosure hanging over his head sounds good here. I still think the easiset (sic) thing would be for you to make an offer.

So the work began.

1.   The Modification:

Exhibit 1 appears as a rather routine, and form modification agreement. It is not.  During the negotiations of the foreclosure case, the elements contained therein were agreed upon by both parties, and *not ordered until both parties agreed to each*.  When the documents arrived, they were delivered to Defense counsel, who reviewed and approved the financial terms, but asked for

11

changes to the mortgage language. Attached and filed as Exhibit 4, is the *originally tendered* Modification with the offending provision highlighted.

The changes requested by Defendant's counsel were all adopted and incorporated into the now complete Exhibit 1. This *included* augmenting the Settlement Agreement with all understandings between the parties, to address counsel's initial concern about the "No Oral Agreements" provision that he mentioned.

No material agreement or understanding is missing. Exhibit 1, which (in combination with Exhibit 2) memorializes everything to which both parties agreed.

B.   THE SETTLEMENT AGREEMENT

Although dozens of conversations and e-mails comprised the context for creating Exhibit 2, just a couple make clear that it represented a complete and definite agreement.

The agreed upon attorneys' fees amount was *updated* from the initial figure of $7800.00 Defendant first requested, to the final figure of **$8515.00**. This occurred during a final pre-agreement telephone conversation during which the final revisions were discussed and agreed to. Each of those final two remaining reservations and suggestions were resolved (as in the augmented attorney's fees) or agreed to (as in the No Oral Agreements addendum) once the offending "incorporation" paragraph from page 4 was removed at Defendant's request.

What resulted was an **agreement** in two parts (Exhibits 1 and 2), which included contributions by **both parties** and omissions agreed to by **both parties,** with **no loose ends.**

    C.    OTHER EVIDENCE INDICATIVE OF AGREEMENT

There were acts done, and documents transmitted by each side indicative of the existence of an agreement.  These are attached to and authenticated by the Declaration of William Fogel and include:

    1)    Counsel's W-9 was transmitted so that the fees check could be ordered.

    2)    To prevent delay, and to assure as close to a simultaneous exchange as possible, the fees check was in process when the agreement was repudiated.

    3)    As the final documentation was exchanged, the parties discussed (and transmitted) a prepaid FedEx airbill prepared by counsel for quick transmission of the signed documents for countersignature.

    D.    CONCLUSION

There is nothing missing, nothing in need of interpretation, and nothing left to imagination or speculation.  There is no circumstantial, or any other kind of evidence which *inconsistent* with the conclusion that there was, in fact, and agreement as to *all* points; not merely the main points, or the financial points.

This was a contract, and it should be enforced.

VII.   THE ALTERNATIVELY REQUESTED DISMISSAL WITHOUT PREJUDICE

As both parties agree, the 14 M.R.S.A. § 6111 notice underlying the foreclosure case is defective as there is a mistake in the amount demanded. Although Plaintiff is certain the Modification and Settlement Agreement are enforceable, should the Court proceed to consider the Dismissal Without Prejudice request, there are two items of relevance that should be considered:

1) The foreclosure was commenced in 2023. Mistakes in Default Notices before January 2024 had universally fatal consequences in which entire assets were lost. The Law Court moderated that harsh result in *J.P. Morgan Acquisitions Corp. v. Moulton,* 2024 ME 13, and *Finch v. U.S. Bank, N.A.,* 2024 ME 2. Mediations with favorable modification outcomes for borrowers were far preferable to the alternatives when this foreclosure was filed. Now, Plaintiffs can demonstrate *why* a case ought to be dismissed without prejudice without suffering a loss of their entire asset. Here, as will be demonstrated, if necessary, the elements of the modification and settlement agreement reached herein certainly provides a base for a Court determination of what equitable conditions a Dismissal Without Prejudice might be granted by Order under F, R. Civ. P. 41(a)(2).

VIII.   CONCLUSION

For all the foregoing reasons, Plaintiff prays this Court enter the following ORDERS:

1) That the stay applicable to this case be Terminated;

2) That Mediation is deemed complete.

3) That the Order to File a Stipulation be rescinded;

4) That the Settlement Agreement Contained within Exhibits 1 and 2 be deemed valid and enforceable with accompanying orders for execution and performance as the Court may deem appropriate; and

5) In the alternative; Order that the case be dismissed without Prejudice.

.

DATED: June 21, 2024

                                                */s/William A. Fogel*
                                               William A. Fogel
                                               Attorney for Wilmington Savings
                                               Fund Society, FSB as Trustee of
                                               Stanwich Mortgage Loan Trust K

Brock & Scott PLLC
30 Danforth Street, Suite 104
Portland, ME 04104
(860) 474- 8747
bill.fogel@brockandscott.com

CERTIFICATE OF SERVICE

I hereby certify that the pleading to which this Certificate of Service is attached was filed electronically via this court's ECF system, and thereby was served electronically upon all parties who have appeared in this case.

DATED:  June 21, 2024

/s/ William A. Fogel
William A. Fogel

16